**ZORRILLA COMMERCIAL CORP., Plaintiff,**

v.

**RYDER/P.I.E. NATIONWIDE, INC. Ryder Truck Lines, Inc., Defendants.**

**No. Civ. 86–0923CC.**

United States District Court, Puerto Rico.

March 9, 1989.

Francisco Ponsa–Flores, San Juan, P.R., for plaintiff.

David C. Indiano, Jiménez, Graffam & Lausell, San Juan, P.R., for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

This is an action for loss of merchandise transported by the defendants Ryder/P.I.E. Nationwide, Inc. and Ryder Truck Lines, Inc. (Ryder) filed by the consignee Zorrilla Commercial Corp. (Zorrilla). Having considered the documentary and testimonial evidence presented at trial and having weighed the latter according to the credibility of the witnesses, the Court makes the following

## FINDINGS OF FACT

Zorrilla is engaged in the business of wholesale and retail sales of automobile parts in Puerto Rico, which it acquires from AC Delco, a division of General Motors Corporation, among others. On November 26, 1984, Ryder signed a straight bill of lading reflecting the shipment of certain automobile parts from consignor, GM Warehousing & Dist.—Burton to consignee Zorrilla through carrier Ryder, shipment number 45–197790.[1] Transportation was by land and sea from Burton, Michigan to Río Piedras, Puerto Rico. According to the corresponding Delco invoice, plaintiff's Exhibit 8, the total cost to Zorrilla of the goods in that shipment was $152,018.41. On November 28, 1984, Ryder signed another straight bill of lading reflecting the shipment of additional automobile parts, again by land and sea from consignor GM Warehousing & Dist.—Burton to consignee Zorrilla, via carrier Ryder, shipment number 45–202667.[2] The corresponding Delco invoice, plaintiff's Exhibit 9, reflects that the cost to Zorrilla of the parts in this shipment was $64,735.36.

Both shipments arrived at Ryder's warehouse in Puerto Rico on December 7, 1984. The merchandise was removed by Ryder from the vans in which it was transported to Puerto Rico and unloaded directly into the Ryder warehouse. On December 12, 1984 Ryder notified Zorrilla that the ship-

1. Exhibit 1 for plaintiff.

2. Exhibit 4 for plaintiff.

ments had arrived. Zorrilla requested that Ryder store these shipments until after January 1, 1985 because it was involved in inventory and Ryder agreed to this arrangement.[3] No charge was made for the storage of the merchandise. On January 10, 1985 Ryder delivered the shipments to Zorrilla. Eloy Veiga, President of Zorrilla, signed the freight bill at 8:05 AM on that date. No written exceptions were noted. The absence of written exceptions is not necessarily indicative of the completeness of the cargo delivered, however, because, as was stated by Mr. Veiga, and Edwin Alvarez–Castro, defendant's Operations Supervisor, it was the practice for the consignee to sign the receipt immediately, so that the driver could leave. The driver who delivered the merchandise did not want to wait until the merchandise was checked. Mr. Veiga called Mr. de Jesús at Ryder, who specifically instructed him to follow the usual procedure. Thereafter, the merchandise was inspected and a claim would be made if there was a shortage. Ryder had consolidated both shipments into its trailer number 296204. Mr. Alvarez–Castro had placed a padlock on the container the day before delivery for which he and Israel Torres, the night supervisor, had the key. Alvarez–Castro did not know if the container had been opened the night before delivery. The alleged morning of delivery, he replaced the padlock with a seal that he testified could not have fallen off. He then dispatched the van from the terminal at on or before 7:00 AM to the Zorrilla warehouse where it was signed in at 8:05 AM. According to the driver, it takes about thirty minutes to drive the distance between these two points. The log book, however, shows that the van was actually checked out the day before, on January 9, 1985, and therefore spent at least the night outside the facilities.[4]

The undisputed evidence established that when the van arrived at Zorrilla, the seal which had been placed on the doors of the van had been removed. This occurred while the goods in the van were in the sole custody of Ryder and its agents. When the doors were opened at Zorrilla, it was observed that the merchandise inside the van was scattered around in a disorderly manner and many of the overpacks in which the goods had been shipped were broken.

In view of this, Zorrilla made an inventory of the merchandise as it was unloaded from the van counting the parts against the invoices. Upon completion of a detailed count of all the merchandise delivered by Ryder, as compared to the corresponding invoices and shipping documents, Zorrilla determined that in the first shipment (number 45–19790), there was a shortage of 25,688 spark plugs, with a factory cost of $24,269.44;[5] and in the second shipment (number 45–202667), there was a shortage of an additional 26,208 spark plugs, with a factory cost of $25,683.84.[6] Total cost to Zorrilla of the goods missing from the two shipments was $49,953.28.[7]

Based on foregoing findings of facts, the Court reaches the following

## CONCLUSIONS OF LAW

Confronted with the uncontroverted evidence of the unexplained delay in delivery time, the padlock for which there were two keys, and which defendant's witness testified could have been opened without his knowing it, a securely placed seal which was missing upon arrival, defendants deny liability claiming that they are not responsible for any discrepancy in the amount delivered because the shipments were made under "shippers load and count" terms, and, under 49 U.S.C.App. Section 101 they

---

3. Pretrial Order filed on January 20, 1987, Uncontested Material Fact "E", p. 7.

4. Defendants' witness, Milton Maymí Santiago, tried to reconcile the discrepancy in the dates as an error. Having observed his demeanor during testimony, the Court gives no credibility to his statements.

5. Exhibit 3 for plaintiff.

6. Exhibit 6 for plaintiff.

7. Zorrilla ordered a replacement shipment from Delco, but still owes for the lost merchandise.

are exempted from liability.[8]

The parties disagree as to whether the bills of lading are in fact marked with the words "shipper's weight load and count or other words of like purport," as required by the statute. A perusal of these documents reveals that the markings in questions which defendants allege to be the letters "SLC" are unclear handwritten notations occurring as part of the signature of the agent on the very bottom of the papers. Defendants' own witness, Mr. Bill Fuell, stated on direct examination that the letters on the bill of lading for the first shipment (Exhibit 1 for plaintiff, corresponding to Exhibit A for defendants) *"look* like it says SLC ... and *if* it's an SL & C, Ryder does not count the merchandise." (Emphasis ours.) Following this hypothetical statement, on cross examination, Fuell again referred to the same document stating, "I agree that you can't really tell what it says there. Could be SJ or SAC.... This one is not clear, though I know drivers try to cover themselves. In our industry we see this all the time."

Fuell then tried to retract this statement, claiming that the writing was clear. As to the second bill of lading (defendants' Exhibit C corresponding to plaintiff's exhibit 2) a two-page document, Fuell stated that the marking on the first page was not as legible as the marking on the second page.

The defendants base their entire defense of shippers load and count on the Fuell testimony as cited above, and case law, *Dublin Company v. Ryder Truck Lines, Inc.,* 417 F.2d 777 (5th Cir.1969), which it claims stand for the proposition that the notation SLC is an acceptable substitute for the words "shipper's load and count." As correctly pointed out by plaintiff in its post-trial memorandum, there was no issue or discussion in *Dublin* as to whether this notation without further elaboration sufficiently complies with the statute.

As commented by Harold D. Miller, Jr., in his article "Shipper Load and Count Shipments," (1973 Transp.L.Inst. 251, at 270), submitted by defendants as Exhibit F of their post-trial memorandum: "Since this constitutes an exception to the generally stringent liability imposed upon the carrier, the statute is narrowly construed. Care should be taken to make any such notations on a bill patently clear as to their intent and purpose."

█ We, therefore, conclude that the bills of lading do not conform to the statutory requirement so as to bring defendants within the protection from liability based on this defense.

█ In any event, in this case Ryder would still be liable to plaintiff Zorrilla, even if it were assumed that the notations in the bills of lading do read "SLC" and even if it were further assumed that the letters "SLC" have the same effect as the words "shipper's load and count," required by 49 U.S.C.App. Section 101. The effect of inserting "shipper's load and count" in a bill of lading is only to establish that the carrier has not counted, and does not guarantee, the number of packages; but such words do not relieve the carrier from liability for the loss or non-delivery of the goods which were actually received by the carrier from the shipper. Accordingly, if by means *other* than the bills of lading, the shipper and/or consignee prove what merchandise was actually delivered to the carrier, then the carrier will be liable for such goods as it did receive, but failed to deliver to the consignee. A carrier who duly inserts the words "shipper's load and count" in a bill of lading, is nevertheless liable for those goods which it actually received from the shipper. *Boatmen's Nat. Bank of St. Louis v. Southwestern Ry. Co.,* 75 F.2d 494 (8th Cir.1935), *cert. den.,* 295 U.S. 751, 55 S.Ct. 830, 79 L.Ed. 1695; *Dwinnell v. Duluth, S.S. & Ap. R. Co.,* 242 Mich. 357, 218 N.W. 649 (1928);

---

**8.** 49 U.S.C.App. Section 101 in its pertinent part reads as follows:

... The carrier may also by inserting in the bill of lading the words "Shipper's weight, load, and count," or other words of like purport, indicate that the goods were loaded by the shipper and the description of them made by him; and if such statement be true, the carrier shall not be liable for damages caused by the improper loading or by the nonreceipt or by the misdescription of the goods described in the bill of lading....

*Norfolk Terminal Corp. v. United States Lines,* 215 Va. 80, 205 S.E.2d 400 (1974).

■ In the present case, regardless of the bills of lading, and based instead upon other evidence admitted at trial, this Court finds that the shipper delivered to Ryder the goods which it subsequently failed to deliver to Zorrilla. Said fact was established by (1) documents issued by the shipper entitled Shipment Listing/Packing Slip (Exhibits 10 and 11 for plaintiff), which list in full detail the nature and quantity of the articles actually loaded by the shipper; and (2) the invoices issued by the shipper to Zorrilla, which list and charge Zorrilla for those same goods (Exhibits 8 and 9 for plaintiff). It is, of course, significant that the items listed in the bills of lading as received by Ryder correspond to the goods listed in the Shipment Listing/Packing Slip as actually shipped, and also with the goods invoiced by the consignor to Zorrilla. Finally, this Court also finds significant that the van left the Ryder terminal on January 9, 1985 with a seal on its doors, but it was not delivered to Zorrilla until the following day, unsealed, and with the goods in unexplainable disorder.

Accordingly, this Court finds that goods valued at $49,953.28 were actually loaded and delivered by Ryder to the consignee. This Court further finds that the shortage occurred while the shipments were under Ryder's sole possession and custody, after Ryder received the goods from the consignor, and before delivery to Zorrilla. Ryder has failed to exonerate itself from liability for this nondelivery. The defendants are liable for the shortage, and, therefore, must pay plaintiff the sum of $49,953.20.

SO ORDERED.